IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

ERIC DAVIS,

        Plaintiff,

v.                                CIVIL ACTION NO.   2:20-cv-00515

LEONARD ALUMINUM UTILITY
BUILDINGS, LLC,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Leonard Aluminum Utility Buildings, LLC's ("Defendant" or "Leonard") Motion for Summary Judgment.  (ECF No. 25.)  For reasons more fully explained herein, the Court **GRANTS** Defendant's Motion.

*I.     BACKGROUND*

*A. Factual Background*

This matter arises out of the termination of Plaintiff Eric Davis's ("Plaintiff" or "Davis") employment with Leonard.   Leonard—a North Carolina limited liability company—is a retailer, manufacturer, and distributor of storage buildings, cargo and utility trailers, truck covers, car ports, and other various structures.   (ECF No. 26 at 1.)   Davis was hired by Leonard on April 9, 2018 to work as a store manager in Leonard's Ripley, West Virginia store.   (*Id.*)   As a store manager, Davis's job duties included achieving Leonard's financial objectives by controlling expenses,

identifying current and future customer requirements, and protecting employees and customers by maintaining a safe, clean and well-organized store.   (ECF No. 25, Ex. C.)

In July 2019, Davis was advised by his physician that he would require one of his toes to be amputated due to complications arising from his diabetic condition.   (ECF No. 27 at 5.) Following his physician's diagnosis, Davis submitted to Leonard an application for benefits under the Family Medical Leave Act ("FMLA") on July 15, 2019.   (ECF No. 26 at 2.)   Importantly, Leonard alleges that Davis was ineligible to receive benefits under the FMLA because it did not employ 50 employees within a 75-mile radius at the time Davis's FMLA application was submitted—a prerequisite to subject Leonard to the FMLA's statutory requirements.   (*Id.* at 7–8.) Nevertheless, Leonard approved Davis's FMLA application for time off, and Davis took several weeks off to recover from his toe amputation from July 18, 2019 until September 9, 2019.   (*Id.*)

Upon his return to work in early-September, Davis was assigned to "light duty" in Leonard's Charleston, West Virginia store, and was permitted to utilize a knee scooter to enable him to perform his job duties.   (*Id.*)   Once Davis returned to Leonard's Ripley store, Davis alleges that his superiors began "treating him differently."   (ECF No. 27 at 5.)   According to Davis, his direct supervisor—Bryan Whittenburg ("Whittenburg")—began "avoiding him" and "nit-picked" his work every time he visited the Ripley store.   (*Id.*)   Conversely, Leonard alleges that Davis's job performance and ability to meet company budget limitations substantially declined during the second half of 2019.   (ECF No. 26 at 2.)   Specifically, Leonard alleges that in late-2019 its Ripley store was the worst performing store in the company in sales and profits, and that Davis struggled to maintain the cleanliness and organization of the store.   (ECF No. 28 at 3.)

On October 30, 2019, Leonard required Davis to complete an "action plan for sales growth and expense management" for the Ripley store.  (ECF No. 26 at 2.)   Leonard alleges Davis was required to complete the action plan as a result of his poor job performance.  (*Id.*)   The action plan included several areas Davis would be responsible for improving, including utilizing social media to advertise the store's inventory, obtaining and acting upon business leads in the Ripley area, reducing excessive store inventory, and maintaining the cleanliness of the store's showroom. (ECF No. 25, Ex. C at 6.)

On December 19, 2019, a little over one month following Davis's completion of the action plan, Leonard CEO Mike Pack ("Pack") visited the Ripley store to perform a preannounced serialized audit with Davis.  (ECF No. 26 at 2.)   Leonard alleges that, during this visit, Pack noticed "very simple things" were not being done at the Ripley store regarding store cleanliness and organization, and expressed his displeasure in the store's conditions to Davis.  (ECF No. 28 at 3.)   Following Pack's visit to the Ripley store, Davis received additional coaching from Whittenburg on maintaining the customer readiness of the store.   (*Id.*)

A few weeks later, however, Whittenburg visited the Ripley store and noticed that Davis had failed to implement his directions for customer readiness.  (*Id.* at 3–4.)   Whittenburg also noticed that Davis failed to implement any of the directives included in his October 2019 action plan.  (ECF No. 26 at 2.)   This prompted Whittenburg to discuss the potential of terminating Davis's employment with his supervisor, Tracy Goss ("Goss"), in early January 2020.   (ECF No. 27 at 9.)   Consequently, because of the substantial decline in Davis's job performance and his refusal to follow the direction of his supervisors, Whittenburg issued Davis a "Final Written Warning" on January 13, 2020.  (ECF No. 26 at 2.)   The Final Written Warning informed Davis

3

that if he failed to take the steps necessary to correct his job performance, then his employment would be terminated.   (ECF No. 25, Ex. C at 7–8.)   Importantly, Davis does not dispute that he failed to implement his supervisors' directions, that he failed to implement any of the directives included in the October 2019 action plan, or that in late 2019 the Ripley store was Leonard's worst performing store.

On March 5, 2020, Leonard began preparing for potential business closures and layoffs, as the COVID-19 pandemic became widespread throughout the United States and worldwide.   (ECF No. 26 at 3.)   On March 11, 2020, the World Health Organization ("WHO") announced that COVID-19 was classified as a "global pandemic."[1]   On March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.[2]   On March 19, 2020, Leonard management discussed layoffs and furloughs due to the tension and economic uncertainty created by the COVID-19 pandemic.   (ECF No. 26 at 3.)   On March 23, North Carolina Governor Roy Cooper issued an executive order banning mass gatherings and mandating closure of various businesses.[3]   That same day, Leonard conducted a company-wide "reduction in force" ("RIF") of 20 employees.   (ECF No. 26 at 3).   According to Leonard, the RIF was made based on "unpredictable business closures and financial hardships anticipated by the COVID-19 pandemic." (*Id.*)   Davis, along with 19 other Leonard employees—including two other store managers who

---

[1] WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020, World Health Organization (2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Oct. 12, 2021).

[2] Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Federal Register (2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak (last visited Oct. 12, 2021).

[3] North Carolina Governor Roy Cooper, Executive Order No. 120, Additional Limitations on Mass Gatherings, Restrictions on Venues and Long Term Care Facilities, and Extension of School Closure Date (Mar. 23, 2020), https://files.nc.gov/governor/documents/files/EO120.pdf (last visited Oct. 12, 2021).

were not disabled, (*see* ECF No. 28, Ex. A at 41–42), was chosen by Leonard for the RIF and his employment was terminated on March 23, 2020.   (ECF No. 27, Ex. 10.)

The parties' ultimate dispute concerns Leonard's reasoning behind Davis's termination. Davis contends his employment was terminated because he is disabled, and because he applied for—and took—FMLA leave to have his toe amputated.   (ECF No. 27 at 10.)   Davis alleges several circumstantial facts he claims create inferences of discrimination by Leonard, (ECF No. 27 at 7–8), but does not dispute Leonard's assertion that his job performance substantially declined in late-2019 or that Leonard faced impending financial uncertainty due to the COVID-19 pandemic.   Conversely, Leonard contends Davis was selected for the RIF due to the substantial decline in his job performance, combined with the impending economic uncertainty related to the COVID-19 pandemic.   (ECF No. 28 at 4.)

### B.  Procedural Background

Based on the above allegations, Davis initiated an action against Leonard in the Circuit Court of Jackson County, West Virginia on June 9, 2020.   (ECF No. 1.)   Leonard removed this action to this Court on July 29, 2020.   (*Id.*)   In his Complaint, Davis alleges three causes of action. (ECF No. 1, Ex. A.)   First, Davis alleges that Leonard's termination of his employment was based, in whole or in part, upon his disability in violation of the West Virginia Human Rights Act ("WVHRA").   (*Id.* at 3.)   Second, Davis alleges that Leonard's termination of his employment was based, in whole or in part, upon Davis engaging in activities related to his request for FMLA leave, in violation of the WVHRA.   (*Id.* at 4.)   Third, Davis alleges that Leonard's termination of his employment constitutes an unlawful retaliatory discharge motived, in whole or in part, by Davis's receipt of or attempt to receive FMLA benefits, in violation of 29 U.S.C. § 2615.   (*Id.*)

In conjunction with his WVHRA claims, Davis also alleges violations of substantial public policies of the State of West Virginia.[4]   (*Id.* at 3–4.)

On June 4, 2021, Leonard filed its Motion for Summary Judgment.   (ECF No. 25.)   Davis responded to Leonard's motion on June 21, 2021.   (ECF No. 27.)   On June 28, 2021, Leonard filed its Reply.   (ECF No. 28.)   As such, Leonard's Motion for Summary Judgment has been fully briefed and is now ripe for adjudication.

## II.    *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."   Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When evaluating such factual issues, the Court must view the evidence "in the light most favorable to the opposing party."   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production."   *Barwick v. Celotex Corp.*, 736 F.2d 946,

---

[4]  In his Response to Leonard's Motion for Summary Judgment, Davis states that he no longer needs to move forward with his public policy claims based upon the WVHRA, and that he does not object to Leonard's Motion for Summary Judgment on this issue.   (ECF No. 27 at 2 n1.)   Accordingly, the Court **GRANTS** Leonard's Motion for Summary Judgment with respect to Davis's public policy claims.

958 (4th Cir. 1984).   Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."   *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."   *Liberty Lobby*, 477 U.S. at 256.   "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff."   *Id.* at 252.

## III.     DISCUSSION

Leonard has moved this Court to grant summary judgment in its favor on each claim alleged by Davis.   (*See* ECF No. 25.)   As noted above, Davis alleges three causes of action against Leonard.   (*See* ECF No. 1, Ex. A at 3–4.)   First, Davis alleges disability discrimination in violation of the WVHRA.   (*Id.* at 3.)   Second, Davis alleges unlawful termination based upon his request for FMLA leave in violation of the WVHRA.   (*Id.* at 4.)   Third, Davis alleges unlawful retaliatory discharge in violation of the Family Medical Leave Act ("FMLA").   (*Id.* at 4.)   This Court begins its analysis with Davis's WVHRA claims before addressing Davis's FMLA retaliatory discharge claim.   For the reasons explained more fully below, this Court finds that Davis has failed to present evidence sufficient to raise genuine issues of material fact as to whether the termination of his employment violated the WVHRA and the FMLA.

7

A. *West Virginia Human Rights Act*

The WVHRA provides that "it shall be an unlawful discriminatory practice for any employer to discriminate against an individual with respect to compensation, hire, tenure, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is . . . disabled[.]"   W. Va. Code § 5-11-9(1).

Actions to redress unlawful discriminatory practices under the WVHRA are governed by the burden-shifting framework of Title VII of the Civil Rights Act of 1964, established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and explained in *Texas Dep't Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).   *See Shepherdstown Volunteer Fire Dept. v. State ex rel. State of West Virginia Hum. Rts. Comm'n*, 309 S.E.2d 342, 351–52 (W. Va. 1983).   Under this framework, a plaintiff bears the initial burden to prove by a preponderance of the evidence a *prima facie* case of employment discrimination.   *See Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561, 581 (W. Va. 1996) (citing *Burdine*, 450 U.S. at 254).   If the plaintiff establishes a *prima facie* case, "the burden of production then shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions." *Id.* at 582 (citing *Burdine*, 450 U.S. at 254).   If the employer meets this burden of production, the burden shifts "once again [to] the employee to prove that the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action." *Id.* (citing *Burdine*, 450 U.S. at 255).

1. *Prima Facie* Case

Leonard first argues that Davis has failed to establish a *prima facie* case of disability discrimination.   (ECF No. 26 at 6.)   To establish a *prima facie* case of disability discrimination under the WVHRA, a plaintiff must show "that he is a disabled person within the meaning of the

law, that he is qualified to perform the essential functions of the job (either with or without a reasonable accommodation), and that he has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises." *Marincil v. Saminco, Inc.*, 662 F. Supp. 2d 577, 581 (S.D. W. Va. 2009) (citing *Skaggs*, 479 S.E.2d at 581 n.22).

Leonard does not dispute that Davis is a disabled individual within the meaning of the WVHRA, and that Davis suffered an adverse employment action—his termination.   (ECF No. 26 at 6.)   Rather, Leonard contends that Davis cannot prove the final element of his *prima facie* case: that he suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises.   (*Id.*)

To establish the final element of disability discrimination under the WVHRA, a plaintiff is required only to establish "an inference of discrimination."   *See Shoemaker v. Alcon Laboratories, Inc.*, 741 F. App'x 929, 933 (4th Cir. 2018) (citing *Knotts v. Grafton City Hosp.*, 786 S.E.2d 188, 195 (W. Va. 2016)).   The plaintiff need not offer direct proof of their discrimination.   *Conaway v. E. Associated Coal Corp.*, 358 S.E.2d 423, 429 (W. Va. 1986).   Nevertheless, the plaintiff "must provide 'some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class.'"   *Shoemaker*, 741 F. App'x at 933 (citing *Conaway*, 358 S.E.2d 423, 429 (W. Va. 1986).

In *Shoemaker*, the Fourth Circuit affirmed the district court's decision to grant summary judgment in favor of a defendant-employer with respect to the plaintiff's WVHRA disability discrimination claim because the plaintiff "failed to establish a *prima facie* case that [the defendant] would not have terminated her employment but for her disability."   *Id.*   Rather, because the defendant-employer accommodated the plaintiff's health issues and only fired her after

she made a "costly mistake" and "exceeded her paid time off without an excuse," the Fourth Circuit held that the plaintiff failed to sufficiently link the defendant-employer's decision to terminate her employment and the plaintiff's status as a member of a protected class. *Id.* Therefore, the plaintiff in *Shoemaker* failed to establish a *prima facie* case of disability discrimination under the WVHRA.

Here, Davis contends the factual circumstances surrounding his termination reveal several inferences which could lead a reasonable jury to conclude Leonard discriminated against him on the basis of his disability and FMLA leave. (ECF No. 27 at 7.) First, Davis contends an inference of discrimination arises from the fact that he was never disciplined prior to taking leave due to his disabling condition, but when he returned his supervisor began "treating him differently" and "nit-picked" his work. (*Id.*) Second, Davis contends an inference of discrimination arises from the proximity in time between his leave and the initiation of discussions regarding the termination of his employment. (*Id.* at 8.) Third, Davis contends an inference of discrimination arises from Leonard's alleged deviation from its standard practice of disciplining employees when it issued Davis the Final Written Warning. (*Id.*)

However, like the plaintiff's circumstances in *Shoemaker*, the factual circumstances offered by Davis fail to sufficiently link his disability and FMLA leave to Leonard's decision to terminate his employment. First, Davis cites no evidence establishing a link between his alleged treatment and his disability or FMLA leave. To be sure, Davis fails to cite any specific instances of Whittenburg—his direct supervisor, Goss—Whittenburg's supervisor, or Pack—Leonard's CEO treating him differently, but simply relies on his own deposition testimony wherein he testified that he "felt like an outsider when [he] came back," that things "seemed . . . very distant

10

between [Whittenburg]," that Whittenburg "started nit-picking" his work, and that "[i]t just felt like [he] wasn't wanted there."   (ECF No. 27, Ex. 1 at 118–23.)   Even if Davis had presented concrete evidence establishing that Leonard management's treatment of him changed in late-2019, still, Davis cites no evidence linking Whittenburg's alleged treatment of him to his disability or FMLA leave.

Second, aside from the proximity in time between Davis's leave and the discussions regarding the termination of his employment, Davis cites no evidence proving those discussions occurred *because* he was disabled or *because* he took FMLA leave.   Rather, the record is replete with examples of the substantial decline in Davis's job performance in late-2019 that led to discussions regarding the termination of Davis's employment—for example, Davis's failure to meet company budget limitations and maintain store cleanliness, (*see* ECF No. 28, Ex. B at 170–72), his failure to implement the October 2019 action plan he created, (*see* ECF No. 28, Ex. C at 1–2), his failure to follow Leonard's CEO's direction regarding customer readiness, (*see* ECF No. 28, Ex. A at 45; ECF No. 28, Ex. C at 1–2), and his numerous failures to implement his direct supervisor's coaching and direction, (*see* ECF No. 28, Ex. A at 33–34, 42).

Finally, Davis fails to sufficiently link Leonard's deviation from its standard discipline practice to his disability or FMLA leave.   Again, the record contains several examples of the substantial decline in Davis's job performance in late-2019, including multiple instances of Davis refusing to follow and implement the directions of his supervisors.   Although Leonard's Employee Handbook contains a "progressive discipline policy" detailing the disciplinary steps to be taken in cases of under-performing employees, (*see* ECF No. 28, Ex. C at 3–4), the policy also states "Leonard reserves the right to . . . skip steps depending on the facts of each situation and the

nature of the offense[]," including "whether the offense is repeated despite coaching, counseling or training."  (*Id.*)  Notwithstanding Leonard's reservation of the right to skip disciplinary steps in its Employee Handbook, Davis has failed to present any evidence establishing a link between Leonard's decision to deviate from its Employee Handbook and his disability.  Rather, the evidence overwhelmingly supports the conclusion that Leonard's deviation from its standard disciplinary procedures was grounded in Davis's repeated failures to implement change in his poor job performance.

Even viewing the evidence in the light most favorable to Davis, the circumstances raised by Davis fail to sufficiently link his termination to his disability and FMLA leave.  Therefore, Davis has failed to establish any inferences of unlawful discrimination and, consequently, has failed to establish a *prima facie* case of disability discrimination under the WVHRA.

2.  Pretext

Even if Davis had met his initial burden of establishing a *prima facie* case of disability discrimination, still, he has failed to establish that the reasons presented by Leonard for his termination are pretextual.

An employer can rebut the plaintiff's *prima facie* case by offering a legitimate, nondiscriminatory reason for the adverse employment action.  Syl. Pt. 2, *Morris Memorial Convalescent Nursing Home, Inc. v. W. Va. Hum. Rts. Comm'n*, 431 S.E.2d 353 (W. Va. 1994). Importantly, the employer's burden in this regard is one of production, not of persuasion; it need only state a reason, not prove one.  *Burdine*, 450 U.S. at 254–55; *see also Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 160 (W. Va. 1995).

12

Once the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove that the stated reason is merely a pretext for the discharge. *Morris Memorial Convalescent Nursing Home*, 431 S.E.2d at 356 (citing *Burdine*, 450 U.S. at 252–54). "Pretext" as it relates to unlawful discriminatory practices "means an ostensible reason or motive assigned as a color or cover for the real reason or motive, or false appearance, or pretense." *Mayflower Vehicle Sys., Inc. v. Cheeks*, 629 S.E.2d 762, 773 (W. Va. 2006). "A reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that the discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Plaintiffs may rely on several types of evidence to prove pretext, including: (1) comparative evidence; (2) statistical evidence; and (3) direct evidence of discrimination, in the form of discriminatory statements and admissions. *See Charleston Town Ctr. Co. v. W. Va. Hum. Rts. Comm'n*, 688 S.E.2d 915, 921 (W. Va. 2009) (citing *Miles v. M.N.C. Corp.*, 750 F.2d 867, 870 (11th Cir. 1985)).

In response to Davis's WVHRA claims, Leonard contends it terminated Davis's employment due a combination of the uncertain economic conditions created by the COVID-19 pandemic and Davis's declining job performance. (ECF No. 26 at 7.) The reasons offered by Leonard for Davis's termination are undoubtedly legitimate and nondiscriminatory, and Davis does not dispute this. Davis does contend, however, that the reasons presented by Leonard are pretextual and that the real motive for terminating his employment is discriminatory. (ECF No. 27 at 9–10.)

In support of his argument that Leonard's purported reasons for terminating his employment are pretextual, Davis points out that Leonard "began discussing the termination of

13

[his] employment in the fall of 2019," and that Leonard's reasons for terminating his employment have changed over time.   (*Id.*)   However, as noted above, Davis fails to dispute that his job performance substantially declined in late-2019, or that Leonard—like many companies across the United States and worldwide—faced impending economic and financial uncertainty due to the COVID-19 pandemic.   Davis's management of Leonard's Ripley store led it to be Leonard's worst performing store, company-wide, by the end of 2019.   (ECF No. 28, Ex. A at 20.)   Davis offered no evidence disputing this, nor did he offer any evidence disputing Leonard's need to conduct the RIF due to the economic and financial uncertainty brought on by the COVID-19 pandemic.   Absent any evidence disputing his declining job performance or Leonard's financial position in the face of the COVID-19 pandemic, Davis has failed to raise any genuine issue of material fact as to whether the otherwise legitimate, nondiscriminatory reasons offered by Leonard are pretextual.

Therefore, because Davis has failed to dispute the legitimate, nondiscriminatory reasons presented by Leonard, he has failed to establish that Leonard's reasons are a pretext for any alleged discriminatory motive.   Again, even viewing the evidence in the light most favorable to Davis, no reasonable jury could conclude that the legitimate, nondiscriminatory reasons presented by Leonard are pretextual.   As such, no genuine issue of material fact exists with respect to the issue of pretext.

Having found that Davis failed to raise any genuine issues of material fact as to whether he established a *prima facie* case of disability discrimination, or whether the legitimate, nondiscriminatory reasons presented by Leonard for terminating his employment are pretextual,

this Court finds summary judgment in Leonard's favor to be appropriate with respect to Davis's WVHRA claims.

### B. Family Medical Leave Act

Davis also alleges Leonard terminated his employment in retaliation against him for exercising rights under the FMLA. The FMLA contains "proscriptive provisions which protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006). "Retaliation" claims alleging violations of these proscriptive rights arise under 29 U.S.C. § 2615(a)(2), which states that "it shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this chapter." *Id.*

Retaliation claims brought under the FMLA are analogous to those brought under Title VII. *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015); *Laing v. Federal Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013); *Yashenko*, 446 F.3d at 550–51. A plaintiff must prove three elements to establish a *prima facie* case of retaliation under the FMLA: (1) that he engaged in "protected activity;" (2) that his employer took an adverse employment action against him; and (3) there was a causal link between the two events. *Adams*, 789 F.3d at 419; *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (en banc).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *Laing*, 703 F.3d at 719 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–04 (1973)). If the employer advances a lawful explanation for

the alleged retaliatory action, the plaintiff must demonstrate that the employer's reason for taking the adverse employment action was pretextual.   *Id.*

       1.  <u>Protected Activity</u>

      Generally, employees that are ineligible to receive FMLA benefits do not engage in "protected activity" when they use, or attempt to use, FMLA benefits. *See Adams v. Buckeye Fire Equipment Co.*, No. 3:19-cv-422-MOC-DSC, 2021 WL 1063796, at *3 (W.D.N.C. Mar. 18, 2021); *Schmidt v. Town of Cheverly*, No. GJH-13-3282, 2014 WL 4799038, at *6 (D. Md. Sep. 23, 2014). This is because the FMLA "does not protect those who are retaliated against for attempting to exercise FMLA rights that they do not possess."   *Schmidt*, 2014 WL 4799038, at *6.   The FMLA defines "eligible employee" as "an employee who has been employed—(i) for at least 12 months by the employer . . . ; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."   29 U.S.C. § 2611(2)(A).   However, the FMLA also specifically exempts from the definition of "eligible employee" any employee who works at a work site at which the "employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that work site is less than 50[.]"   29 U.S.C. § 2611(2)(B)(ii).

      Here, Davis does not dispute that—at the time he requested FMLA leave—Leonard did not employ 50 employees within a 75-mile radius of its Ripley store.   Therefore, at the time he requested FMLA leave, Davis was exempt from the statutory definition of "eligible employee" under the FMLA.   Because Davis was ineligible to exercise rights under the FMLA, he did not engage in "protected activity" under the FMLA when he attempted to exercise those rights. Accordingly, this Court finds that Davis has failed to establish a *prima facie* case because he was

not eligible to receive FMLA benefits when he requested them, and therefore Davis did not engage in "protected activity" under the FMLA.

       2.  <u>Equitable Estoppel</u>

Davis argues the doctrine of equitable estoppel should be applied in this case to preclude Leonard from asserting ineligibility as a defense to his FMLA retaliation claim.   (ECF No. 27 at 11–16.)   The doctrine of equitable estoppel is applicable "when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation."   *Bakery and Confectionery Union and Indus. Intern. Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1027 (4th Cir. 1997).   "[T]he party claiming the estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse.'"   *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984).

The Fourth Circuit has not yet applied equitable estoppel in the context of FMLA eligibility.   *See Schmidt*, 2014 WL 4799038, at *6.   *But see Yaskowsky v. Phantom Eagle, LLC*, No. 4:19cv9, 2020 WL 809378, at *9 (E.D. Va. Feb. 18, 2020) (applying equitable estoppel in the context of FMLA eligibility).   A lengthy discussion contemplating the merits of applying equitable estoppel in the context of Davis's FMLA retaliation claim is unwarranted, though, because Davis has failed to present evidence establishing that he detrimentally relied on Leonard's representation to him that he was eligible for FMLA benefits.   *See generally Romans v. Wayne Cnty. Comm'n*, No. 3:20-0797, 2021 WL 4005614, at *4 (S.D. W. Va. Sep. 2, 2021).

Under the doctrine of equitable estoppel, a party fails to establish detrimental reliance when they had no ability to change their position based on another party's misrepresentations.   *See Palan v. Inovio Pharmaceuticals Inc.*, 653 F. App'x 97, 102–03 (3d Cir. 2016) (noting that the

plaintiff "point[ed] to no action or statement that indicated that his decision to have [a] surgery was contingent on his understanding of his FMLA status"); *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557–58 (6th Cir. 2009) (noting that there was "no evidence in the record to show that [the plaintiff] 'change[d] his position' in reliance on the belief that his leave would be FMLA-protected").

Here, Davis has failed to offer evidence establishing that he detrimentally relied on Leonard's misrepresentation to him that he was eligible for FMLA benefits.   The only evidence Davis offers to establish detrimental reliance is an affidavit wherein he testifies, among other things, that "if [he] had been informed by Leonard that [he] was not eligible for FMLA benefits [he] would have explored any and all options available to [him] to have the surgery performed and maintain [his] employment with Leonard."   (ECF No. 27, Ex. 5 at 3.)   Critically, however, Davis's affidavit fails to establish that his decision to have his toe amputated was contingent on his understanding of his FMLA status.   Although Davis notes other options concerning his leave, the urgent nature of his diabetic condition is undisputed.   Whether Davis utilized vacation time, regular time off, or FMLA leave, his need for the procedure was urgent and he would have gone through with it regardless of the status of his FMLA eligibility.

The affidavit offered by Davis also fails to sufficiently link his decision to take FMLA leave and Leonard's decision to terminate his employment.   Upon his return from his surgery, Davis worked for over seven months and had several conversations with Leonard management concerning his job performance until his eventual layoff on March 23, 2020.   Although Davis's affidavit states that he believes "[his] employment was terminated, in whole or in part, due to applying for and/or taking FMLA leave," he fails to substantiate his belief with any evidence

18

linking Leonard's decision to terminate his employment and his decision to apply for, and take, leave under the FMLA.   Rather, Leonard's argument that Davis's termination had nothing to do with his FMLA, but occurred due to his declining job performance combined with the impending financial and economic uncertainty caused by the COVID-19 pandemic, is squarely bolstered by the fact that 19 other Leonard employees—including two other store managers—were also included in the RIF.   (ECF No. 26 at 6–7.)

Therefore, because Davis has failed to offer sufficient evidence establishing that he detrimentally relied upon Leonard's misrepresentations, the doctrine of equitable estoppel does not preclude Leonard from asserting Davis's ineligibility as a defense to his FMLA retaliation claim.   Because Davis was not eligible to receive FMLA benefits, he did not engage in any "protected activity" and cannot maintain an action for retaliation under the FMLA.   Accordingly, no genuine issue of material fact exists with respect to whether Davis engaged in "protected activity" under the FMLA.

Having found that Davis failed to raise any genuine issues of material fact as to whether he engaged in "protected activity" under the FMLA, this Court finds summary judgment in Leonard's favor to be appropriate with respect to Davis's FMLA retaliation claim because Davis has failed to establish a *prima facie* case of FMLA retaliation.

*IV.     CONCLUSION*

For the reasons stated above, Leonard's Motion for Summary Judgment (ECF No. 25) is **GRANTED**, and this case is **DISMISSED** and retired from the docket of this Court.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        October 20, 2021

_____

THOMAS E. JOHNSTON, CHIEF JUDGE

20